Filing # 78276695 E-Filed 09/21/2018 06:30:25 PM

IN THE CIRCUIT COURT OF THE
TWENTIETH JUDICIAL CIRCUIT IN AND
FOR LEE COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

| | | |
|---|---|---|
| SPIGOT, INC., POLARITY TECHNOLOGIES LTD., and EIGHTPOINT TECHNOLOGIES LTD., | : | Index No. |
| Plaintiffs, | : | |
| —against— | : | **COMPLAINT** |
| JEREMY MATTHEW HOGGATT and MEDIAVO INC., | : | |
| Defendants. | : | |

Plaintiffs Spigot, Inc. ("Spigot"), Polarity Technologies Ltd. ("Polarity"), and Eightpoint Technologies Ltd. ("Eightpoint") (collectively, the "Plaintiffs"), by and through its undersigned counsel, commence this action against defendants Jeremy Matthew Hoggatt ("Hoggatt") and Mediavo, Inc. ("Mediavo") (collectively, the "Defendants") seeking to enjoin Defendants from utilizing Plaintiff's confidential Trade Secrets, as described below, to recover damages arising from Defendants' wrongful actions and misappropriation of Plaintiffs' Trade Secrets, and respectfully allege as follows:

## NATURE OF THE ACTION

This is a trade secret infringement case which centers around certain Trade Secrets and business strategies developed by a company named Adknowledge, Inc. ("Adknowledge") and purchased by Plaintiffs in September 2016. Adknowledge is headquartered in Kansas City, Missouri and has offices in Florida, among other states, and internationally. At all times relevant to this action, Adknowledge operated various interconnected Business Channels, including the Video Channel, the Native Advertising Channel, the Social Media Channel, the Apps Channel,

and the Email Channel, which shared services and proprietary information across those channels, and helped Adknowledge grow into one of the world's largest privately held advertising networks. The relevant Business Channels for purposes of this action are the Email Channel and the Apps Channel.

To advance its business, Adknowledge's Apps Channel developed certain trade secrets, including a Life Time Value ("LTV") model, an LTV power curve, an LTV multiplier, proprietary desktop extension products, confidential business strategies, confidential advertising and marketing strategies, confidential affiliate business methods and other confidential strategies described below, to maintain a competitive advantage in the marketplace (collectively, the "Apps Channel Trade Secrets" or "Trade Secrets"). The Apps Channel employed numerous software engineers, business analysts, and other experienced employees who specialized in the monetization of desktop and mobile applications to develop the Trade Secrets. The Apps Channel Trade Secrets allowed the Apps Channel to become one of Adknowledge's fastest growing Business Channels. As described below, Adknowledge and Plaintiffs engaged in numerous efforts to shield the Trade Secrets from competitors and maintain confidentiality of the Trade Secrets within the company. During the relevant time, Defendant Hoggatt was a top Senior Executive at Adknowledge. Hoggatt had access to, and did access, the Apps Channel Trade Secrets.

In September 2016, Plaintiffs purchased the Adknowledge Apps Channel Trade Secrets, along with other assets and the business relationships of certain App Channel employees as part of an Asset Purchase Agreement ("APA"). Thereafter, seizing on an opportunity to exploit the timing of the APA, Hoggatt aggregated confidential information and documents pertaining to the purchased Apps Channel Trade Secrets, quit his position at Adknowledge, and used the Apps

2.

Channel Trade Secrets to form Mediavo, a direct competitor to Plaintiffs and the purchased assets.

As discussed below, Mediavo's product offerings and strategy are nearly identical to Plaintiffs' and it is clear that Hoggatt and Mediavo are utilizing the confidential strategies and Trade Secrets developed by Adknowledge and sold to Plaintiffs. Moreover, Hoggatt and Mediavo's use of Plaintiffs' Trade Secrets is evident given the short time period between Hoggatt's exit from Adknowledge and the quick ramp up of identical services at Mediavo. These acts have caused Plaintiffs significant harm, and therefore Plaintiffs are entitled to relief.

## THE PARTIES

1.     Plaintiff Spigot is a Nevada corporation with its principal office location in Fort Myers, Florida. The Fort Myers office employs over 70 full-time employees.

2.     Plaintiff Polarity is a Cyprus company with its principal place of business in Cyprus.

3.     Plaintiff Eightpoint is a Cayman Islands company with its principal place of business in the Cayman Islands.

4.     Defendant Hoggatt is a former employee of Adknowledge, Inc. who is now the CEO of Mediavo and resides at 1220 SW Coachlight Dr., Lees Summit, Missouri in Jackson County.

5.     Defendant Mediavo is a Delaware corporation with its principal place of business in Kansas City, Missouri. Mediavo is registered as a foreign company eligible to conduct business in Florida that spends thousands of dollars a day targeting and advertising to individuals located in Florida.

3

## JURISDICTION AND VENUE

6.　　This Court has personal jurisdiction over Hoggatt under Fla. Stat. 48.193 as he operated, conducted, engaged in and / or carried on a business or business venture in the State of Florida through Mediavo; committed tortious acts within Florida, including but not limited to misappropriation of trade secrets and other proprietary, confidential information of the Plaintiffs, including Spigot Inc., a Florida corporation. Hoggatt is also subject to personal jurisdiction in this Court because, on information and belief, he has engaged in substantial and not isolated contacts in the state of Florida as he makes, and has systemically made, frequent trips to Florida in the course of his duties for Adknowledge and, upon information and belief, in the course of his duties for Mediavo, and has, purposefully directed his business activities in the State, by, among other things, contracting through Mediavo with a minimum of 245,000 residents of Florida who downloaded Defendants' extensions and accepted the terms of Defendants' online clickwrap agreement in Florida and used the Defendants' extensions in Florida.

7.　　This Court has personal jurisdiction over Mediavo under Fla. Stat. 48.193 as it operated, conducted, engaged in and / or carried on a business or business venture in the State of Florida; committed tortious acts within Florida, including but not limited to misappropriation of trade secrets and other proprietary, confidential information of the Plaintiffs, including Spigot Inc., a Florida corporation. Mediavo is also subject to personal jurisdiction in this Court because it has engaged in substantial and not isolated contacts in the state of Florida as it has purposefully directed its business activities in the State, by, among other things, spending thousands of dollars a day targeting and advertising to individuals located in Florida and have contracted with a minimum of 245,000 residents of Florida who downloaded Defendants' extensions, accepted the terms of Defendants' online clickwrap agreement in Florida, and used the Defendants'

4

extensions in Florida.

8.      Venue is proper in this county because Hoggatt and Mediavo are nonresidents and they can be sued in any county in this state.

9.      Defendants' products were built and operated using the misappropriated Trade Secrets.

10.     During the relevant period, Hoggatt regularly communicated via email and telephone with persons in Florida to directly compete with Plaintiffs using the misappropriated Trade Secrets.  During the time he was improperly collecting the Apps Channel Trade Secrets, Hoggatt (1) also directed numerous communications, including via email, into Florida; (2) attended Adknowledge strategy meetings in Florida which included the discussion and dissemination of Apps Channel Trade Secrets; and (3) regularly worked from Adknowledge's Florida office.

11.     Upon information and belief, at least one of Mediavo's employees resides within Florida and conducts Mediavo business within the state.

12.     This Court has personal jurisdiction over Mediavo and Hoggatt. The court has jurisdiction over the Defendants because as described above: (1) Mediavo has transacted and continues to transact business in this county; (2) the causes of action asserted in this case arose from or are connected with purposeful acts committed by Mediavo and Hoggatt, in whole or in part, in this county; and/or (3) Mediavo and Hoggatt have had continuous and systematic contacts with this county by engaging in numerous activities that have had an effect in this State. As a registered foreign company, Mediavo is amenable to service in this jurisdiction.

## FACTUAL BACKGROUND

### A. Adknowledge Develops Proprietary LTV Model, Extension Products, Confidential Business Strategies, Confidential Advertising and Marketing Strategies, and Affiliate Techniques (the "Trade Secrets").

13.    Adknowledge, a digital advertising and software development company, was formed in 2002.    At the time relevant to this action, Adknowledge operated various interconnected Business Channels which shared proprietary information across those channels which helped Adknowledge grow into one of the world's largest privately held advertising networks.    Adknowledge's Business Channels included the Video Channel, the Native Advertising Channel, the Social Media Channel, the Apps Channel and the Email Channel.

14.    The relevant Business Channels for purposes of this action are the Email Channel and the Apps Channel.

15.    The Apps Channel focused on creating, designing, and developing proprietary software and web browser applications and extensions for desktop computers and mobile phones.  The Apps Channel monetized these applications and extensions through agreements with large search engines where the Apps Channel shared in the revenue generated from each click on an ad from the search engines.

16.    The Apps Channel was a high growth area for Adknowledge and by 2015 was one of Adknowledge's largest sources of profit.

17.    The Email Channel focused on monetizing emails and email list management. The Email Channel was later merged with the mobile apps part of the Apps Channel under the name ReachMobi, a wholly owned subsidiary of Adknowledge.

18.    Hoggatt was the General Manager in charge of the Adknowledge Email Channel, and later the CEO of Reachmobi, which combined the Email Channel with the mobile assets of

the Apps Channel not purchased by the Plaintiffs. Hoggatt was an early employee with Adknowledge, and worked from Adknowledge's headquarters in Kansas City, MO from July 2009 and also routinely communicated with Adknowledge's employees in the Florida office and regularly worked from the Florida office where the Apps Channel employees were also located.

19.     Hoggatt routinely interacted with the employees, including the senior level managers, in the Apps Channel, who discussed the Apps Channel operations with Hoggatt in response to inquiries from Hoggatt. Hoggatt was also included on emails containing the Apps Channel Trade Secrets.

20.     Hoggatt's level of importance and senior position at Adknowledge was well known not only internally, but externally: his work profile and picture was listed on Adknowledge's website under "The Company" next to the founder of Adknowledge, the Chief Executive Officer of Adknowledge, the President of Adknowledge and the Chief Legal Officer of Adknowledge[1].

21.     From approximately 2012 until the sale of those Apps Channel assets to Plaintiffs in September 2016, Adknowledge spent an enormous amount of time and money developing profitable strategies to expand its browser extension business. In less than two years, the Apps Channel grew from $0 to over $100,000 per day in revenue using the Apps Channel Trade Secrets.

22.     To grow its extensions business, the Apps Channel focused on building a user base which would generate revenue over each user's lifetime. The techniques and strategies used by the Apps Channel were different than the other Adknowledge Business Channels. To

---

[1] Tellingly, after being notified by Plaintiffs of his improper conduct related to this action, Hoggatt eliminated all reference to his long tenure at Adknowledge from his LinkedIn profile, and now falsely states that he worked for ReachMobi since 2009. However, ReachMobi did not exist until almost 7 years later. *See* https://www.linkedin.com/in/matthoggatt/ (last accessed September 20, 2018).

that end, Adknowledge devoted hundreds of millions of dollars and approximately four years to developing a proprietary lifetime value model (the "LTV Model") into the Apps Channel Trade Secrets to analyze the value of a user over time so that the Apps Channel could determine the profitability of potential investments.

23.     This LTV Model and strategy required a much different operational approach than is standard in the industry. Prior to Adknowledge's entrance into the market, Google was the main source of search ads and monetization of desktop extensions, and there was only one major player in the desktop extensions space.

24.     Because Adknowledge did not use Google as a source of monetization, and Adknowledge's search ad provider, Yahoo, had a lower monetization than Google, the Apps Channel developed an LTV Model using unique inputs and a different algorithm, along with a new strategy for displaying the ads.

25.     In order to compete against the Google-powered competitor, Apps Channel engineers and business analysts expended significant time and money to test out and tune these strategies which became the basis of the LTV Model and other Trade Secrets. Through these efforts, Adknowledge was able to successfully compete with the main Google-powered competitor and take significant market share in the space.

26.     Under the LTV approach, the Apps Channel would quantify a user's acquisition cost based on expected performance over the lifetime of that user using their own monetization sources in order to achieve targeted investment payback and margin benchmarks. Unlike the LTV approach, Google-powered extensions often take a random "shotgun" approach to deploying extensions in almost any vertical. The Apps Channel, however, took a "precision-guided" approach based on significant prior research and testing before identifying verticals

which could compete against Google-powered extensions.

27.     Using the Apps Channel unique LTV Model, the Apps Channel was able to project the decay rate of a user's revenue stream and thus guide business decisions regarding which verticals that company should target and devote capital.

28.     Adknowledge dedicated substantial resources to develop the LTV Model, devoting significant capital and time to aggregating data, and designing a specific financial algorithm, all of which would be used to guide the Apps Channel's proprietary strategic decisions.

29.     Adknowledge's Apps Channel also developed Confidential Business Strategies for maximizing the Return on Investment ("ROI") on an extension, Confidential End-User, Advertising and Marketing Strategies specific to extensions, and Affiliate Marketing Strategies and high value Customer Lists which included lists of publishers and affiliates who would distribute Adknowledge Apps Channel extensions for a share in the revenue.  In addition, the Apps Channel had a separate agreement with Yahoo, Inc., which contained a specific revenue share and whose confidentiality was closely guarded by all employees within the Apps Channel. The Apps Channel also designed proprietary Chrome Strategies regarding placement and rotation of extensions in the Google Chrome Web Store.  All of these Strategies and Trade Secrets helped Plaintiffs become a leader in the marketplace and made Plaintiffs' products achieve a greater conversion rate than other competitors.

30.     Using these Trade Secrets, Adknowledge had determined which nontraditional segments and verticals were most profitable and monetized those areas, whereas competitors without access to the Trade Secrets did not spend any significant resources in these verticals.

31.     Using the Trade Secrets, Adknowledge also developed, at great time and expense,

9

a niche customer list of both Affiliates who could profitably distribute the Apps Channel extensions on a specific cost-per-installation method, and of publishers from whom Adknowledge had determined, using the Trade Secrets, it could profitably buy traffic directly from. Adknowledge closely protected the prices it paid to both Affiliates and Publishers.

32.     By 2015, Adknowledge relied on the Apps Channel Trade Secrets for maximizing the Return on Investment ("ROI") on an extension and became an industry leader in the extension space. These Trade Secrets were developed by and unique to Adknowledge and were purchased by Plaintiffs.

33.     Adknowledge took great measures to protect these Trade Secrets from disclosure. Adknowledge required all employees to sign confidentiality and nondisclosure agreements. The Apps Channel developed guidelines and polices to prevent the dissemination of the Trade Secrets outside of Adknowledge.  Financial projections, revenue and LTV graphs, as well as access to the databases that stored financial data, were all protected by unique user names and passwords.

34.     The Trade Secrets provided Adknowledge with a competitive advantage in the marketplace.

**B.   Spigot, Polarity, and Eightpoint Enter into Asset Purchase Agreement with Adknowledge in September 2016 and Acquire the Trade Secrets.**

35.     Spigot, Polarity, and Eightpoint purchased certain assets from Adknowledge and Adknowledge EN, Inc. (a subsidiary of Adknowledge) as part of an Asset Purchase Agreement (the "APA") dated September 21, 2016.  Among those assets purchased, which included the Apps Channel Trade Secrets, Plaintiffs acquired:

> Section 1.1(a)(iv): all Intellectual Property used exclusively in the Acquired Business (the "**Acquired Intellectual Property**"), including, without limitation, the Intellectual Property listed in Schedule 1.1(a)(iv);....

10

Section 1.1(a)(xi): all current lists, records and other information pertaining to suppliers and customers (including customer lists, customer mailing lists and customer sales files), all current lists, records and other information pertaining to accounts, personnel and referral sources, all drawings, specifications, reports, studies, plans, books, ledgers, files, documents, correspondence and relevant business and accounting records, all advertising, marketing and promotional materials, and all other printed or written materials, in each case relating exclusively to the Acquired Business (the "Seller Records");

36.    Section 3.13(g) of the APA states:

With respect to each trade secret of the Seller included in the Acquired Intellectual Property or Acquired Joint Use Intellectual Property: (i) the Seller has taken all reasonable precautions to protect the secrecy, confidentiality and value of such trade secret; and (ii) to the Seller's Knowledge, such trade secret has not been used, divulged or appropriated either for the benefit of any Person (other than the Seller) or to the detriment of the Seller, except pursuant to a confidentiality agreement.

37.    "Intellectual Property" was expressly defined in Section 7.1 of the APA as:

"Intellectual Property" means all of the following in any jurisdiction throughout the world: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof ("Patents"); (b) all trademarks, service marks, trade dress, logos, designs, slogans, trade names, corporate names, Internet domain names, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith; (c) all copyrightable works, all copyrights and all applications, registrations and renewals in connection therewith; (d) all mask works and all applications, registrations and renewals in connection therewith; (e) all trade secrets (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals); (f) all computer Software (including Source Code, executable code, data, databases and related documentation); (g) all domain names and applications; (h) all advertising and promotional materials; (i) all other proprietary rights; and (j) all copies and tangible embodiments of any of the foregoing (in whatever form or medium).

38.    As part of the APA, and concurrent with the APA, all of the Apps Channel Adknowledge employees related to the Apps Channel left Adknowledge to join Spigot and

continue working on the purchased assets.  Hoggatt was not one of the Adknowledge employees who joined Spigot.

39.     Plaintiffs, having purchased the Apps Channel Trade Secrets at a great expense, were aware that the Apps Channel Trade Secrets were, and are, extremely valuable.  As such, Plaintiffs insisted the APA contain a Non-Competition clause at Section 5.3 (the "Non-Compete") with Adknowledge.

40.     The Non-Compete was included to protect Plaintiffs' investment in the purchased assets.  The clause would, among other things, prevent seller restricted parties from using the Trade Secrets acquired by Plaintiffs.

41.     Hoggatt, in his capacity as a high-level executive at Adknowledge, is bound by the Non-Compete and should not be able to directly compete with Plaintiffs using the Trade Secrets.

### C.  While at Adknowledge, Hoggatt Was Privy to the Trade Secrets and Confidential Materials Relating to the LTV Model, Extensions Business, and Confidential Strategy.

42.     Hoggatt joined Adknowledge in 2009 as Director of Engineering and held that position until February 2011.  In February 2011, Hoggatt was promoted to Vice President, and in November 2011 was again promoted to General Manager at the company.  He held the senior position of General Manager from November 2011 until he left in October 2017 to found Mediavo.

43.     While in his capacity as a senior executive at Adknowledge, Hoggatt was privy to the Apps Channel's confidential materials and Trade Secrets.  To wit, Hoggatt received emails containing financial modeling and projections, the LTV Model, strategy presentations, and confidential information containing the Trade Secrets.

44.     Hoggatt was privy to and accessed Apps Channel Trade Secrets regarding which categories and verticals to target the extensions business. He attended quarterly meetings with Adknowledge's search partner and was exposed to Apps Channel Trade Secrets, confidential presentations and strategies.

45.     Hoggatt participated in weekly executive meetings where Apps Channel financials and business strategies were discussed. In preparation for these meetings, Hoggatt received confidential presentations and financial projections which contained the Trade Secrets.

46.     Hoggatt regularly visited the Apps Channel offices in Florida, worked from the same office and communicated directly with Apps Channel employees under the guise of transparency between Adknowledge Business Channel operations.

47.     Despite the fact that Adknowledge engaged in active measures to protect its confidential business strategies and Trade Secrets, including password protecting documents and requiring employees to enter non-disclosure and confidentiality agreements, Hoggatt gained possession of the Trade Secrets via his executive role at the company.

48.     Due to his own Confidentiality Agreement with Adknowledge, Hoggatt was aware that Adknowledge limited dissemination of the Apps Channel Trade Secrets, including the confidential strategy and modeling.

**D. Hoggatt Left Adknowledge, Absconding with the Trade Secrets, and Formed Mediavo as a Direct Competitor Using Plaintiffs' Trade Secrets.**

49.     Shortly after the APA was signed, Hoggatt left Adknowledge to form a direct competitor, Mediavo.

50.     Mediavo, a digital marketing company, directly competes with Plaintiffs to distribute competing desktop extensions to internet users which are monetized mainly through search advertising. Mediavo describes itself as such: "At Mediavo we are quickly staking our

claim as one of the premier digital marketing companies in the world. With offices around the globe we keep our finger on the pulse of the online market 24/7. As masters of innovation and technology, we are focused on unlocking consumer intent across multiple online channels. Our exclusive partnerships and trusted status with giants of the online industry have propelled us to the top of the industry and continue to keep us ahead of the curve. Through a valuable combination of innovative consumer products and publisher partnerships, Mediavo has achieved online marketing success at massive scale." *See* URL: https://www.linkedin.com/company/mediavoinc/ (last accessed Sept. 20, 2018); and; "Mediavo is broadening the search experience by unlocking consumer intent across multiple online channels." *See* URL: http://www.Mediavo.com (last accessed Sept. 20, 2018).

51.    Mediavo's job postings, which mirror those of the positions for Plaintiffs, state "Come work for one of the fastest growing companies in Kansas City."

52.    Mediavo, at the direction of CEO Hoggatt, is directly competing with Plaintiffs by developing, advertising, and distributing substantially similar copies of Plaintiffs' extensions using the Trade Secrets.

53.    In fact, Mediavo's job postings are mirror images of Plaintiffs' employee positions, which also include "Digital Media Buyer." For example, one job posting on Mediavo.com, states:

> **Media Buyer**
> **Come work for one of the fastest growing companies in Kansas City.** Located in the thriving Crossroads District. The Media Buyer is a mission critical role, focused on executing user acquisition campaigns using paid online media (search, social, display, …) and managing online distribution partnerships with key companies. Our media buyer is a confident team member, **managing over $3M per month in media spend.** Primary duties include:
>
> Launching and owning online advertising campaigns across major search, display, and social networks, with the goal of having new users download our products.

14

- Owning all steps of the media buying and ad operations process:
- Text and image creative creation, split testing, and optimization.
- Landing page optimization.
- Performance reporting.
- **Source level CPA optimizations to hit product LTV** and ROI target.

Performing market research to identify competitive strategies, refine paid media strategies and identify market place opportunities for new products and pitches.

*See* URL: http://mediavo.com/careers/media-buyer/ (last accessed Sept. 20, 2018). (emphasis added).

54.     Upon information and belief, the only way Mediavo could become "one of the fastest growing companies in Kansas City" was by using the misappropriated Trade Secrets. As the job posting for Media Buyer shows, Defendants are not only hiring for the exact same positions at Plaintiffs' with the same experience, they are also requiring the candidates to have experience to meet the "product LTV," which is one of Plaintiffs' Trade Secrets.

55.     Moreover, Mediavo would not be spending in excess of $3,000,000 in advertising but for using the Plaintiffs' Trade Secrets and copying Plaintiffs' proprietary business model.

56.     Upon information and belief, before leaving Adknowledge, Hoggatt aggregated confidential emails, customer lists, documents, and presentations concerning the LTV Model, proprietary data, and strategy.

57.     Upon information and belief, Hoggatt aggregated these confidential materials and Trade Secrets so that he could employ them at Mediavo and mirror Adknowledge and Plaintiffs' business strategy, as shown in the examples below within Section E.

58.     Without knowledge of the LTV Model and strategy regarding which verticals to invest capital, Hoggatt and Mediavo would not have been able to directly compete with Plaintiffs.

59.     The browser extension industry is a niche market and requires highly skilled employees for companies to reach profitability.   It is a trial-and-error business that costs

15

companies like Adknowledge and Spigot millions of dollars to gain appropriate data before profitability can be established – that is, unless one absconded with Plaintiffs' Trade Secrets and immediately gained massive market share because of the use of these misappropriated Trade Secrets, like Hoggatt and Mediavo.

60.     Mediavo also used Yahoo as its monetization source.  Mediavo was able to build its business and increase internet traffic significantly faster than would have been achieved but for the use of Plaintiffs' Trade Secrets.

61.     During this same time, Plaintiffs' traffic and revenues decreased by tens of thousands of installations and dollars per day as Plaintiffs were forced to compete with Mediavo on the same keywords for the same internet users with the exact same products.

62.     Upon information and belief, Hoggatt and Mediavo would not have been able to reach these benchmarks so quickly without using the Trade Secrets at issue.

63.     In a telling video interview posted after he founded Mediavo, Hoggatt made certain admissions as to Mediavo, referencing his time at Adknowledge (dishonestly referenced as ReachMobi) and the success he expects from targeting "non-obvious" places:

   a) 2:22-2:25: Hoggatt admits that he "benefited greatly from" his time at Adknowledge.

   b) 2:27-47: Hoggatt admits that during the last year or two at ReachMobi (Adknowledge), he had the "itch to start my own company and that was something that was in my plans for a while and something I wanted to do. And that is kind of where Mediavo came from."

Thus, during the time he was accessing the Trade Secrets, Hoggatt admits that he had plans to start his own company and why Mediavo was created.

   c) 4:28-31: Hoggatt notes there are "very smart" people at Adknowledge.

Those "very smart people" are the people who developed the Trade Secrets which Hoggatt absconded with to form Mediavo.

16

d) 7:25:  Hoggatt discusses his decision to leave ReachMobi/Adknowledge and what Mediavo does: "ReachMobi, over the past couple of years, has been on a phenomenal tear; basically tripled the business the past couple of years, things are going really well, it is not the time a CEO is going to leave. ...Why would anyone ever leave because this is when you are enjoying that hard work you put in? When I made the decision...most people were very surprised as you would imagine."

Indeed, the entire Adknowledge team was surprised to learn Hoggatt was leaving for a startup because of his senior position at Adknowledge. The Adknowledge/Reachmobi business was "on a tear" because of the Trade Secrets at issue in this matter.

e) 14:03:  Hoggatt discusses what he is up to at Mediavo: "If I **can replicate** the same culture that I had before, we can't help but be successful....From a product perspective, our bet at Mediavo is that what we are really good at is identifying consumer intent across the internet in **non-obvious places**.  And connecting that consumer intent in a non-search type traffic but then connecting those with search advertisers...  Which, that is something I have done for a long time."

Those "non-obvious places" were part of the Trade Secrets that Hoggatt learned of while at Adknowledge.

f) 16:49: "Our tech stack is almost all in the cloud...its all AWS"
Plaintiffs employ the same "tech stack" using AWS (Amazon Web Services cloud-based platform).

g) 17:19: "We are 100% focused on what we do well, what our competitive advantage is and that's our products. That's the place you want to be. That's the place you're going to win."

As discussed throughout this Complaint, Mediavo's "products" are copies of Plaintiffs' products, which are advertised in the same "non-obvious" places on the internet and compete directly with Plaintiffs.

*See* URL: https://www.youtube.com/watch?v=116M-1cJDtU (last accessed Sept. 20, 2018).

### E.  Plaintiffs Discover Mediavo and Hoggatt's Misappropriation of Trade Secrets.

64.    In or about November 2017, Plaintiffs discovered various competitor browser extension ads running in search engines where Plaintiffs advertise their own extensions. These competitor extensions were in the same nontraditional verticals Plaintiffs had identified and consider to be Trade Secrets. These competing ads were confusingly similar to Plaintiffs' ads, copying much of the text and intent of Plaintiffs' ads. In addition, these competing ads were

using higher bids than Plaintiffs, driving up Plaintiffs' costs and lowering the amount of installations Plaintiffs would receive due to the lower position of Plaintiffs' ads on a search engine results page.

65.     Upon investigation, Plaintiffs discovered that Mediavo and Hoggatt were behind the nearly identical extension offers, ads, and ad landing pages that used the Plaintiffs' Trade Secrets. As shown below, some of the websites Hoggatt used to run these offers were: MapsNow.co, MapsFinder.co. Plaintiffs discovered Hoggatt using the exact same Advertising Strategies described in the confidential information shared with Hoggatt while he was working at Adknowledge. For example, Hoggatt was copying the exact same extensions in the same verticals identified by Plaintiffs. In addition, Hoggatt was using the same rotational extension strategies where a new offer would be substituted if Google disabled an extension in the Chrome Web Store, which is all illustrated in the following examples:

a.   Defendants' Current Landing Page (the "Ad"):



b.   Plaintiffs' Landing Page From Ad at (a):



c.  Defendants' Confusingly Similar Landing Page from Ad at (a):



d.  Defendants' Previous Landing Page (MapsFinder.co) Disabled By Google



e.   Defendants' Previous Landing Page MapsFinder.co Disabled By Google



f.   Internet Traffic Graph Showing the Quick Ramp Up of the New Offer From Ad at
     (a) After Google Disabled MapsFinder.co



g. Time Between Hoggatt Launching Mediavo and the Immediate Ramp of the Defendants' Competing Offer Using The Plaintiffs' Trade Secrets



66.     Upon information and belief, Hoggatt and Mediavo are utilizing the Trade Secrets, copying Plaintiffs' proprietary trade dress and code as discussed above in furtherance of their own commercial interests.

67.     Upon information and belief, Hoggatt and Mediavo are utilizing the Trade Secrets discussed above to the detriment of Plaintiffs.

21

68.     Upon information and belief, Hoggatt and Mediavo knew that the information they took and used constituted "Trade Secrets."

69.     Upon information and belief, Hoggatt improperly collected the Trade Secrets, confidential strategies, and customer lists at issue in this matter.

**F.   Defendants are Deceiving Consumers via Deceptive Trade Practices.**

70.     In addition, Defendants have marketed their services and extensions in a way that is likely to cause confusion in the marketplace as to the extensions installed since they look virtually identical to the manner Plaintiffs market and display their services and extensions. As a result, consumers who intended to use Plaintiffs' services are instead induced into using Defendants' services believing they are the same.

71.     Defendants have also incorporated into their unfair competition strategy the ability to disable competing extensions from the web browsers of users downloading their extension, thus negatively impacting Plaintiffs' future business.   Defendants' extensions effectively disable previously downloaded Plaintiff extensions.

72.     Upon information and belief, Plaintiffs have suffered damages, including but not limited to, Mediavo's extensions overwriting and disabling Plaintiffs' extensions already on users' computers, by driving up the Plaintiffs' advertising costs, through the loss of continuing business relationships, and the loss of reputation among current and potential clients.

**FIRST CAUSE OF ACTION**
**(Misappropriation of Confidential and Proprietary Information and Trade Secrets Against Hoggatt and Mediavo under Florida Uniform Trade Secrets Act – Fla. St. 688.001, et seq.)**

73.     Plaintiffs restate and re-allege each and every foregoing paragraph of this Complaint as if fully set forth herein.

74.     As set forth above, Plaintiffs' customer lists, business strategy, reliance on a confidential LTV Model, Extension Products, Confidential Business Strategies, Confidential

22

Advertising and Marketing Strategies, and Affiliate Techniques constitute confidential Trade Secrets.

75.     Plaintiffs and Adknowledge took all reasonable steps to protect the Trade Secrets from public disclosure, including but not limited to, password protecting documents containing Trade Secrets and requiring employees enter into nondisclosure agreements.

76.     The Trade Secrets at issue were disseminated internally at Adknowledge on a limited basis and solely as necessary.

77.     In his high-level role at Adknowledge, Hoggatt received emails containing confidential financial summaries, models, and strategy overviews. Hoggatt also attended weekly executive meetings where Trade Secrets and business strategies were discussed.

78.     As Hoggatt received emails containing confidential information, attended meetings discussing Trade Secrets and strategy, and generally had access to Adknowledge files and presentations, he undoubtedly possessed Plaintiffs' confidential Trade Secrets.

79.     Upon information and belief, Hoggatt aggregated confidential materials and strategy memoranda before leaving Adknowledge.

80.     Upon information and belief, Hoggatt wrongfully used such information to directly compete with Plaintiffs by forming Mediavo and utilizing the Trade Secrets to target specific users and verticals.

81.     Hoggatt and Mediavo used Plaintiffs' Trade Secrets without express or implied consent when Hoggatt and Mediavo knew or had reason to know, at the time of the disclosure and/or use, that its knowledge of the Trade Secrets was derived through improper means.

82.     As a result of Defendants' wrongful conduct, Plaintiffs have suffered harm, including, but not limited to, damages in an amount to be determined at trial, but not less than

$10,000,000.00, representing lost revenue from the acquisition of new users and the increase in cost associated with Defendants' directly competing on the same keywords in Google's AdWords advertising platform, and other platforms, thereby driving up the costs for Plaintiffs.

83.     Hoggatt and Mediavo's misappropriation of Plaintiffs' Trade Secrets was willful and malicious.

## SECOND CAUSE OF ACTION
### (Violation of Florida's Deceptive and Unfair Trade Practices Act (FDUTPA))

84.     Plaintiffs restate and re-allege each and every foregoing paragraph of this Complaint as if fully set forth herein.

85.     This is a claim for violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-501.2101.

86.     FDUTPA provides that unfair methods of competition, unconscionable acts and practices, and unfair or deceptive acts or practices in the conduct "of any trade or commerce" are unlawful. Fla. Stat. §501.204. Under FDUTPA, "trade or commerce" is defined to include any advertisement or solicitation relating to any "thing of value." Fla. Stat. § 501.203(8).

87.     As part of the APA, Plaintiffs purchased the Trade Secrets from Adknowledge, which included the LTV model, an LTV power curve, an LTV multiplier, proprietary desktop extension products, confidential business strategies, confidential advertising and marketing strategies, confidential affiliate business methods and other confidential business strategies described below, to maintain a competitive advantage in the marketplace. Adknowledge and Plaintiffs engaged in numerous stringent efforts to shield the Trade Secrets from competitors and maintain confidentiality of the Trade Secrets within the company.

88.     The Trade Secrets allowed the Apps Channel to become one of Adknowledge's fastest growing Business Channels, and until Defendants began imitating Plaintiffs' extensions

24

and services, there were no direct competitors in the State of Florida.

89.     However, Hoggatt improperly collected confidential information, high value customer lists, and Trade Secrets before leaving Adknowledge, and used these Trade Secrets to establish Mediavo as a direct competitor. Indeed, Defendants began marketing their services and their web browser extension in a manner that is virtually identical to the manner used by Plaintiffs.

90.     By imitating Plaintiffs' business model, marketing strategy, and extensions, Defendants have created confusion in the marketplace by inducing consumers to believe that they are using Plaintiffs' services when, in fact, they are using Defendants' services. This, in concert with the conduct described above, constitutes deceptive and unfair trade practices.

91.     In addition, Defendants are engaging in unfair and deceptive trade practices by, among other actions, building into the download of their extensions the ability for Defendants to disable extensions downloaded from Plaintiffs.

92.     As discussed above, Defendants' extensions are coded in such a manner to disable a user's previously downloaded extensions

93.     Defendants' deceptive and unfair trade practices have caused Plaintiffs to suffer damages, including lost business.

### THIRD CAUSE OF ACTION
#### (Preliminary Injunction Against All Defendants)

94.     Plaintiffs restate and re-allege each and every foregoing paragraph of this Complaint as if fully set forth herein.

95.     Plaintiffs seek to enjoin Defendants and their agents and representatives from maintaining and using the Trade Secrets Hoggatt misappropriated from Adknowledge.

96.     There is a substantial likelihood that Plaintiffs will prevail on the merits of their

trade secret misappropriation claims because the prior relationship between the parties and the services provided by Defendants' products and services indicates a very high likelihood that Defendants misappropriated Plaintiffs' Trade Secrets.

97.     There is also a substantial likelihood that Plaintiffs will prevail on the merits of its FDUTPA claim.  Defendants have engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as described above, and such acts include: (1) Hoggatt improperly collecting confidential information, customer lists, and Trade Secrets before leaving Adknowledge to establish Mediavo as a direct competitor and create confusion in the marketplace, and (2) automatically disabling Plaintiffs' extensions when Defendants' extensions are downloaded by a user.

98.     If the Court does not grant a preliminary injunction, Defendants will continue their activities that misappropriate Plaintiffs' acquired Trade Secrets.

99.     If the Court does not grant a preliminary injunction, Defendants will continue to benefit from its unfair and deceptive practices to the detriment of Plaintiffs, who will continue to suffer from a loss of business relationships and reputation among current and potential clients.

100.    Plaintiffs will likely suffer irreparable injury if the Court does not enjoin Defendants from utilizing its Trade Secrets in the loss of continuing business relationships and loss of reputation among current and potential clients.

101.    Defendants will not suffer undue hardship or loss as a result of the issuance of a preliminary injunction and issuance of a preliminary injunction would not adversely affect the public interest.

102.    Plaintiffs ask the Court to set this request for preliminary injunction for hearing at the earliest possible time and, after hearing the request, issue a preliminary injunction against

Defendants.

## JURY DEMAND

103.    Plaintiffs hereby demand trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand the following relief:

a.    That judgment be entered in favor of Plaintiffs and against Defendants on the claims as set forth above in an amount to be determined at trial, as well as interest, costs, and attorney's fees;

b.    A preliminary injunction requiring Defendants cease and desist from utilizing the misappropriated Trade Secrets and confidential business strategies; and

c.    Such other relief as the Court deems just, proper, and equitable.

Dated:   Miami, Florida
         September 21, 2018

REED SMITH LLP

By: /s/ M. Cristina Cardenas

M. Cristina Cardenas
Florida Bar No. 672491
1001 Brickell Bay Drive, Suite 900
Miami, FL 33131
Tel: (786) 747-0200
Fax: (786) 747-0299
ccardenas@reedsmith.com

Christopher W. Healy (*pro hac admission pending*)
599 Lexington Avenue, 22nd Floor
New York, NY 10022
Tel: (212) 521-5400
Fax: (212) 521-5450
chealy@reedsmith.com

*Attorneys for Plaintiffs*

27