**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

SPIGOT, INC., POLARITY
TECHNOLOGIES LTD., and EIGHTPOINT
TECHNOLOGIES LTD.,

       Plaintiffs,

v.

JEREMY MATTHEW HOGGATT and
MEDIAVO INC.,

       Defendants.

---

MEDIAVO INC.,

       Counterclaimant,

v.

SPIGOT, INC., POLARITY
TECHNOLOGIES LTD., and EIGHTPOINT
TECHNOLOGIES LTD.,

       Counter-Defendants,

and

RYAN STEPHENS

Third-Party Defendant.

Case No. 2:18-cv-00764-JES-CM

Removed from Circuit Court of the Twentieth
Judicial District in and for Lee County,
Florida, Case No. 2018-CA-4601

---

**DEFENDANTS' FIRST AMENDED ANSWER TO FIRST AMENDED COMPLAINT**
**AND COUNTERCLAIMS**

       Defendants JEREMY MATTHEW HOGGATT ("Hoggatt") and MEDIAVO INC.

("Mediavo", and collectively with Hoggatt, "Defendants"), by and through their undersigned

counsel, hereby answer Plaintiffs' First Amended Complaint, and state as follows:

1.      Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

2.      Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

3.      Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

4.      Defendants admit the allegations in this Paragraph.

5.      Defendants admit that Mediavo is a Delaware corporation with a principal place of business in Kansas City, Missouri. Defendants deny the remainder of the allegations in this Paragraph.

6.      Defendants admit that Hoggatt, in the course of his duties for Adknowledge, was required to visit Florida a few times to participate in meetings and conferences during those trips, and manage some Adknowledge employees in Florida that had no connection to the business ultimately purchased by Plaintiffs. Defendants deny the remainder of the allegations in this Paragraph.

7.      Defendants admit that Mediavo established a DBA in Florida with a Florida mailing address. Defendants further admit that some residents in Florida installed Mediavo's extensions, accepted the terms of Mediavo's online clickwrap agreements, and used Mediavo's extensions in Florida. Defendants deny the remainder of the allegations in this Paragraph.

8.      This Paragraph is a legal conclusion and no response is required.

9.      Defendants have insufficient information to form a belief as to whether Adknowledge's Florida-based team developed any trade secrets that were purchased by Plaintiffs. Defendants deny the remainder of the allegations in this Paragraph.

10.     Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

11.     Defendants admit that Hoggatt directed communications into Florida, traveled to Florida a few times on business, and attended meetings in Florida, all in the course of his duties for Adknowledge. Defendants deny the remainder of the allegations in this Paragraph.

12.     This Paragraph is a legal conclusion and no response is required.

13.     Defendants deny that the "Business Channels" shared proprietary information. Defendants have insufficient information to form a belief as to the remainder of the allegations in this Paragraph and therefore deny those allegations.

14.     Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

15.     Defendants deny that the "Apps Channel" focused on software, application and extensions for mobile phones. Defendants have insufficient information to form a belief as to the remainder of the allegations in this Paragraph and therefore deny those allegations.

16.     Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

17.     Defendants admit that the "Email Channel" focus on monetizing emails and email list management. Defendants deny the remainder of the allegations in this Paragraph.

18.     Defendants admit that Hoggatt was an employee of Adknowledge, Inc., that he was the General Manager in charge of the "Email Channel," and later the CEO of ReachMobi, that he worked from Adknowledge's headquarters in Kansas City starting in or about July 2009, that in the course of his duties for Adknowledge he communicated with Adknowledge's employees in its

Florida office, and that at least some of the "Apps Channel" employees worked in Adknowledge's Florida office. Defendants deny the remainder of the allegations in this Paragraph.

19.    Defendants admit that Hoggatt, in the course of his duties for Adknowledge, interacted with Adknowledge employees, including (in limited form) the senior level managers in the "Apps Channel." Defendants deny the remainder of the allegations in this Paragraph.

20.    The materials on Adknowledge's website speak for themselves. Defendants admit that Hoggatt's senior position at Adknowledge was well known internally. Defendants have insufficient information to form a belief as to the remainder of the allegations in this Paragraph and therefore deny those allegations.

21.    Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

22.    Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

23.    Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

24.    Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

25.    Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

26.    Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

27.    Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

28. Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

29. Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

30. Defendants deny that competitors without access to Plaintiffs' alleged trade secrets did not spend any significant resources in the subject verticals. Defendants have insufficient information to form a belief as to the remainder of the allegations in this Paragraph and therefore deny those allegations.

31. Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

32. Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

33. Defendants deny that the subject databases were all protected by unique user names and passwords. Defendants have insufficient information to form a belief as to the remainder of the allegations in this Paragraph and therefore deny those allegations.

34. Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

35. The "APA" speaks for itself. Defendants have insufficient information to form a belief as to the remainder of the allegations in this Paragraph and therefore deny those allegations.

36. The "APA" speaks for itself.

37. The "APA" speaks for itself.

38.   Defendants admit that Hoggatt was not one of the Adknowledge employees who joined Spigot. Defendants have insufficient information to form a belief as to the remainder of the allegations in this Paragraph and therefore deny those allegations.

39.   Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

40.   The "APA" speaks for itself. Defendants have insufficient information to form a belief as to the remainder of the allegations in this Paragraph and therefore deny those allegations.

41.   Defendants deny the allegations in this Paragraph.

42.   Defendants admit that Hoggatt joined Adknowledge in 2009 as Director of Engineering and held that position until February 2011. Defendants further admit that, in February 2011, Hoggatt was promoted to Vice President, and in November 2011 was again promoted to General Manager at Adknowledge. Defendants deny the remainder of the allegations in this Paragraph.

43.   Defendants admit that Hoggatt received some financials and high-level information during his tenure at Adknowledge. Defendants deny the remainder of the allegations in this Paragraph.

44.   Defendants deny the allegations in this Paragraph.

45.   Defendants admit that Hoggatt, in the course of his duties for Adknowledge, participated in weekly executive meetings where financials and high-level information were discussed. Defendants further admit that, in preparation for these meetings, Hoggatt received presentations and financial projections. Defendants deny the remainder of the allegations in this Paragraph.

46.   Defendants deny the allegations in this Paragraph.

47.    Defendants have insufficient information to form a belief as to what was purchased by Plaintiffs. Defendants deny the remainder of the allegations in this Paragraph.

48.    Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

49.    Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

50.    Defendants admit that he executed agreements with Adknowledge. Defendants deny the remainder of the allegations in this Paragraph.

51.    Defendants deny the allegations in this Paragraph.

52.    Defendants admit that Turakhia introduced Hoggatt to Arcus. Defendants further admit that Media.net provides extensions that Mediavo distributes, for which Mediavo receives a fee. Defendants admit that Turakhia was previously affiliated with Media.net. Defendants deny the remainder of the allegations in this Paragraph.

53.    Defendants deny the allegations in this Paragraph.

54.    Defendants admit the allegations in this Paragraph.

55.    Mediavo's job postings speak for themselves. Defendants deny the remainder of the allegations in this Paragraph.

56.    Defendants deny the allegations in this Paragraph.

57.    Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

58.    Defendants admit that Mediavo has sought to hire candidates that have experience to meet LTV. Defendants deny the remainder of the allegations in this Paragraph.

59.    Defendants deny the allegations in this Paragraph.

60.   Defendants deny the allegations in this Paragraph.

61.   Defendants deny the allegations in this Paragraph.

62.   Defendants deny the allegations in this Paragraph.

63.   Defendants admit that the browser extension industry is a niche market and requires highly skilled employees for companies to reach profitability. Defendants deny the remainder of the allegations in this Paragraph.

64.   Defendants deny the allegations in this Paragraph.

65.   Defendants have insufficient information to form a belief as to the allegations in this Paragraph and therefore deny those allegations.

66.   Defendants deny the allegations in this Paragraph.

67.   Defendants admit that Hoggatt made the statements that are directly attributed to him. Defendants deny the remainder of the allegations in this Paragraph

68.   Defendants deny that the "competing ads" copied "Plaintiffs' ads". Defendants have insufficient information to form a belief as to the remainder of the allegations in this Paragraph and therefore deny those allegations.

69.   Defendants deny that they used any of Plaintiffs' "Trade Secrets". Defendants admit that they used MapsNow.co to run certain offers. Defendants deny that Hoggatt copied Plaintiffs' extensions or strategies. The identified websites speak for themselves. Defendants have insufficient information to form a belief as to the remainder of the allegations in this Paragraph and therefore deny those allegations.

70.   Defendants deny the allegations in this Paragraph.

71.   Defendants deny the allegations in this Paragraph.

72.   Defendants deny the allegations in this Paragraph.

73.     Defendants deny the allegations in this Paragraph.

74.     This Paragraph is a re-allegation and no response is required.

75.     Defendants deny the allegations in this Paragraph.

76.     Defendants deny the allegations in this Paragraph.

77.     Defendants deny the allegations in this Paragraph.

78.     Defendants admit that Hoggatt received emails containing information that is not trade secret protected. Defendants further admit that Hoggatt attended weekly meetings where generic business strategies were discussed. Defendants deny the remainder of the allegations in this Paragraph.

79.     Defendants deny the allegations in this Paragraph.

80.     Defendants deny the allegations in this Paragraph.

81.     Defendants deny the allegations in this Paragraph.

82.     Defendants deny the allegations in this Paragraph.

83.     Defendants deny the allegations in this Paragraph.

84.     Defendants deny the allegations in this Paragraph.

85.     This Paragraph is a re-allegation and no response is required.

86.     Defendants deny the allegations in this Paragraph.

87.     Defendants deny the allegations in this Paragraph.

88.     Defendants deny the allegations in this Paragraph.

89.     Defendants deny the allegations in this Paragraph.

90.     Defendants admit that Hoggatt received emails containing information that is not trade secret protected. Defendants further admit that Hoggatt attended weekly meetings where

generic business strategies were discussed. Defendants deny the remainder of the allegations in this Paragraph.

91.     Defendants deny the allegations in this Paragraph.

92.     Defendants deny the allegations in this Paragraph.

93.     Defendants deny the allegations in this Paragraph.

94.     Defendants deny the allegations in this Paragraph.

95.     Defendants deny the allegations in this Paragraph.

96.     Defendants deny the allegations in this Paragraph.

## **AFFIRMATIVE DEFENSES**

Without admitting any wrongful conduct on the part of Defendants, and without admitting that Plaintiffs suffered any loss, damage, or injury, Defendants allege the following affirmative defenses to the First Amended Complaint. By designating the following as affirmative defenses, Defendants do not in any way waive or limit any defenses which are or may be raised by their denials, allegations, and averments set forth herein. Defendants also do not, by alleging any affirmative defense, admit that Plaintiffs do not have the burden of proof for any or all facts underlying any of those defenses. These defenses are pled in the alternative, and are raised to preserve the rights of Defendants to assert such defenses, and are without prejudice to their ability to raise other and further defenses.

### **First Affirmative Defense – Contributory Negligence**

The Complaint fails, in whole or in part, because Plaintiffs were contributorily negligent to the extent they failed to take reasonable efforts to protect the allegedly misappropriated trade secrets from disclosure.

**Second Affirmative Defense – Failure to Mitigate**

Defendants deny Plaintiffs have suffered any damages, but even if they have, Plaintiffs have failed to mitigate such damages by protecting the allegedly misappropriated trade secrets from disclosure

**Third Affirmative Defense – Readily Ascertainable**

The Complaint fails, in whole or in part, because the allegedly misappropriated trade secrets are readily ascertainable and/or generally known.

**Fourth Affirmative Defense – Unclean Hands**

The Complaint, in whole or in part, is barred by the doctrine of unclean hands, because Plaintiffs' actions demonstrate that they brought this lawsuit for the sole purpose of stifling legitimate competition.

**Fifth Affirmative Defense – Waiver**

The Complaint fails, in whole or in part, because Plaintiffs and/or the putative trade secret owner(s) voluntarily relinquished any trade secret rights alleged in the Complaint.

**Prayer for Relief**

Wherefore, Defendants pray as follows:

1.   that Plaintiffs take nothing by reason of their Complaint, and that judgment be rendered in favor of Defendants;

2.   that Defendants be awarded their attorney's fees and costs incurred in defense of this action; and

3.   that the Court award such other and further relief as is just and proper.

## COUNTERCLAIMS

## INTRODUCTION

1.      Spigot, Inc. ("Spigot") – backed by Polarity Technologies Ltd. ("Polarity") and Eightpoint Technologies Ltd. ("Eightpoint") – holds itself out as a digital marketing company that produces browser extensions for consumer installation. A browser extension is a software module that customizes a user's internet browsing experience. Some extensions offer easy access to driving directions. Others allow consumers to more readily access weather conditions and delivery tracking services.

2.      In truth, Spigot, Polarity and Eightpoint (collectively, "Counter-Defendants") traffic in malware. Their extensions don't simply customize a consumer's browser experience as advertised. Their extensions also contain hidden code that – once installed – hijacks browsers and prevents consumers from accessing other products and services. This functionality is never disclosed to the consumer.

3.      Concerns regarding Counter-Defendants' extensions are well documented. In fact, a simple internet search for "spigot browser extension" yields multiple sites that offer advice on how to uninstall Counter-Defendants' "unwanted" and "malicious" products.

4.      Ryan Stephens, Spigot's CEO ("Stephens" or "Third-Party Defendant"), has had it out for Hoggatt and his company, Mediavo Inc. ("Mediavo"), for more than two years. But not because of alleged "trade secrets" – which neither Hoggatt nor Mediavo ever accessed. Stephens's real gripe – as he confessed to Hoggatt on or about May 24, 2018 – is that Hoggatt dared to enter the browser extension marketplace. Stephens even admitted that his primary motive was to force Hoggatt and Mediavo to "get out of the extension space."

5.      It is one thing to want your competitor to exit the market. It is quite another to employ deception to prevent consumers from acquiring and using your competitor's product. That is exactly what Counter-Defendants and Third-Party Defendant Stephens have done.

6.      In or about June 2019, Mediavo discovered several lines of code hidden in an extension called SearchEncrypt, a product offered by Counter-Defendants. The hidden code has no connection to SearchEncrypt's advertised purpose. Instead, the code takes surreptitious control of a consumer's browser – i.e., without the consumer's knowledge or consent – and prevents the consumer from installing or using at least six unrelated products not offered by Spigot.

7.      The products targeted by the hidden code offer driving directions and package tracking services. The only thing they have in common is that they are all offered by Spigot's competitors. Although there are hundreds, if not thousands, of competitors to Spigot, Spigot decided to almost exclusively target Mediavo – at least five of the six targeted products are distributed by Mediavo.

8.      In none of the materials presented to SearchEncrypt consumers is it made clear that SearchEncrypt will prevent them from installing unrelated products. Nor is there any legitimate reason for preventing SearchEncrypt consumers from installing the targeted products. The only reason for the hidden code is Stephens's malice toward Hoggatt and Mediavo. But that malice cannot justify widespread deception of the consuming public, hidden manipulation of personal computers throughout the country and underhanded interruption of Mediavo's legitimate business relationships.

**THE PARTIES**

9.      Mediavo is a Delaware corporation with its principal place of business in Kansas City, Missouri.

10.     On information and belief, Spigot is a Nevada corporation with its principal office location in Fort Myers, Florida.

11.     On information and belief, Polarity is a Cyprus company with its principal place of business in Cyprus.

12.     On information and belief, Eightpoint is a Cayman Islands company with its principal place of business in the Cayman Islands.

13.     On information and belief, Stephens is the CEO of Spigot and a resident of Fort Myers, Florida.

**GENERAL ALLEGATIONS**

A.     **Matt Hoggatt has spent over twenty years building his reputation and relationships in the digital marketing industry.**

14.     Matt Hoggatt ("Hoggatt") has spent much of his professional life building a respected reputation in the digital marketing industry. In July 2009, he joined Adknowledge, Inc. – one of the world's leading digital advertising companies – as part of AdStation, a division responsible for email content delivery. Although he was first hired as a Director of Engineering, Hoggatt was quickly recognized for his leadership ability, technical skills, business judgment and relationship orientation, i.e., his ability to establish the trust and commitment of business partners. For that reason, Hoggatt quickly rose through the ranks at AdStation, becoming the Vice President of Products and ultimately the General Manager of AdStation.

15.     As part of internal restructuring occurring in or around February 2017, Adknowledge consolidated AdStation with another division responsible for mobile applications. The amalgamated organization was spun off and named ReachMobi, at or about which time Hoggatt was installed as ReachMobi's CEO.

**B.      Hoggatt became interested in building a browser extension company after reviewing publicly available information.**

16.    Hoggatt began to think about leaving ReachMobi in 2017. As he explored his options, Hoggatt took a careful look at other companies in the digital advertising industry. One company with whom Hoggatt was already very familiar is Mindspark. Mindspark specializes in desktop browser extensions – commonly referred to as "extensions" – and is a very large and profitable company in that market.

17.    Because Mindspark is owned by InterActiveCorp, a publicly traded company, Hoggatt was able to readily obtain all of Mindspark's financials and LTV. Hoggatt was very impressed with Mindspark's success and began to consider how to build a company that could compete with Mindspark in the extension marketplace.

**C.      Extensions are cheap to produce and many offer the same service.**

18.    An extension is a small unit of software that a consumer can install on their web browser (e.g., Google Chrome, Microsoft Edge, Safari) to add features and functionality. The manufacturers of web browsers – Google, Microsoft, Apple – support the production and distribution of extensions because extensions (at their best) allow consumers to greatly enhance their internet experience.

19.    Millions of consumers use extensions to obtain driving directions and weather reports, test their internet speed, read news and recipes, track their package deliveries, and perform many other tasks. Multiple extensions compete to offer many of the most popular services (e.g., maps, weather, etc.). As a result, consumers have a lot of choice when it comes to extensions. Last year, it was estimated that Google alone hosted nearly 200,000 extensions in the Chrome Store, Google's online store for the Chrome web browser.

20.    Most of the time, as in the case of Mediavo's extensions, consumers do not pay to install or use extensions. Instead, Mediavo's and others' extensions present consumers with advertisements. When those ads are displayed to a consumer or a consumer engages with an ad, that triggers a payment from the advertiser to the company responsible for the extension, like Mediavo. Companies that produce and distribute extensions are expected to advise their users about this practice and abide by all applicable privacy laws with respect to any personal data they collect about their users.

21.    Extensions are inexpensive to produce. Any web programmer can create an extension within days or even hours. So it's well known that extensions are potentially quite profitable. On the other hand, given the ease of entry into this market, competition is fierce, especially since there are numerous companies targeting the same consumers with highly-similar products.

22.    Apart from the wealth of publicly available information that Hoggatt could access about Mindspark from Mindspark's own website, Hoggatt also had access to numerous public sources of information, including Google's Chrome Store itself. The Chrome Store offers extensive and comprehensive data about extensions. For example, it offers access to customer reviews of extensions, identifies which extension verticals are most successful, and lists which extensions have the highest number of installations and users. Thus, the size and growth of every extension on Chrome is freely available to anyone who wants that information.

**D.    To succeed in the extension business, companies need capital and preferred commercial deals.**

23.    At about the same time Hoggatt was considering his next move, he was approached by a business acquaintance, Divyank Turakhia. Turakhia had recently sold his prior company, Media.net. Hoggatt and Turakhia had one or more discussions about Hoggatt's desire to build a

new digital advertising company, after which Turakhia introduced Hoggatt to a venture capital firm called Arcus Capital.

24.     Hoggatt decided at this point to leave ReachMobi to launch Mediavo, a new digital advertising company focused on extensions. Hoggatt was motivated by Mindspark's success, which – as far as Hoggatt could tell – had nothing to do with intellectual property or trade secrets. Among other things, what Mediavo needed to succeed was startup capital and relationships.

**E.      Spigot is a Mediavo competitor that – through its partnership with Polarity and Eightpoint – built a business on misrepresentation and deceit.**

25.     While there are many reputable companies in the extension space, there are also, unfortunately, a number of bad actors.

26.     Spigot is one such company. In or around February 2015, Third-Party Defendant Stephens left a position with Adknowledge – where he was peers with Hoggatt – to join Spigot. On or about September 25, 2015, a Chinese company called Genimous Technology acquired a 100% stake in Spigot. Spigot entered the extension marketplace sometime later.

27.     Spigot does not own any of the extensions it offers to market. Spigot's extensions are actually owned by Eightpoint, a Genimous subsidiary based in the Cayman Islands, which is itself an affiliate of another Genimous subsidiary based in Cyprus – Polarity. It is believed that Genimous established Eightpoint and Polarity so that it could transfer ownership and profits of Spigot's extensions to offshore tax-favored jurisdictions.

28.     Unlike Mediavo's legitimate products, Spigot's extensions are considered malware – software that is intentionally designed to cause damage to a computer. Indeed, there are numerous websites that identify Spigot as a purveyor of malware and complain about their products (the "Malicious Extensions").

29.   Counter-Defendants and Stephens use false and deceptive advertising to encourage users to install the Malicious Extensions. For example, on the About page for one of their products, SearchEncrypt, Counter-Defendants and Stephens assert that SearchEncrypt "protects your privacy by detecting searches that may be tracked and tied to your personal information." An almost identical assertion appears on the About page for another of Counter-Defendants' Malicious Extensions, HideMySearches: "The Hide My Searches extension protects your privacy by detecting searches that may be tracked and tied to your personal information."

30.   But these Malicious Extensions do not, in fact, merely (if at all) detect searches that are tied to personal information. The primary function of these Malicious Extensions—which is not disclosed to consumers—is to intercept a consumer's search query and then send it instead to a "search results" page operated by Counter-Defendants. This "search results" page, however, contains almost no organic search results. Instead, it provides mostly sponsored ads, for which advertisers pay a fee to Counter-Defendants when a user clicks on them.

31.   Although Counter-Defendants' use of SearchEncrypt and HideMySearches to redirect online searches may not by itself be illegal, what is clearly illegal is Counter-Defendants' use of Hidden Code (defined below) to specifically target and hijack Mediavo's products and Counter-Defendants' misleading failure to disclose the Malicious Extensions' true primary function.

**F.   Jealous of Hoggatt's progress, Stephens complained to Hoggatt and Mediavo's customers – making clear his malicious intent.**

32.   As indicated earlier, Hoggatt was able to leverage his industry relationships and access to capital to build a company that could compete in the extension business. This upset Spigot's CEO, Stephens, because Spigot had entered the marketplace earlier, Stephens didn't like competition and Stephens feared that Mediavo would be a strong competitor to Spigot.

18

33.    Stephens began to explore ways he could frustrate Mediavo's business. On or around May 24, 2018, six months after Mediavo was founded, Stephens asked to have a "courtesy call" with Hoggatt. During the call, Stephens relayed that he was upset with Hoggatt "personally" and felt "betrayed" by Hoggatt. When Hoggatt asked him to explain, Stephens accused Hoggatt of stealing Spigot's intellectual property and trade secrets but refused to provide any details.

34.    At the end of the call, Hoggatt asked Stephens what he could do to resolve the situation. Stephens's response was decidedly clear: he would accept nothing less than Mediavo's departure from the browser extension marketplace.

35.    Around the same time of his call to Hoggatt, Stephens also called and complained to one or more Mediavo customers. In those calls, Stephens accused Mediavo of copying Spigot's business by building extensions that offered the same services as Spigot's extensions. But countless other competitors in the space do so as well. Stephens also complained that Mediavo seemed to know which extensions were most profitable – though that information is readily available online. These accusations were malicious and designed to unfairly hurt Mediavo.

**G.    Counter-Defendants and Stephens altered the code for their Malicious Extensions so that they prevented consumers from installing or using Mediavo's products.**

36.    Realizing that its baseless threats against Mediavo weren't having the intended effect, Counter-Defendants and Stephens decided to play dirty.

37.    Unbeknownst to their users or the consuming public, Counter-Defendants and Stephens added several lines of code (the "Hidden Code") to their Malicious Extensions.

38.    This Hidden Code serves only one purpose – to block the installation and operation of at least six competitor extensions. The targeted extensions include GoMapsAndDirections, DirectionsFound, MapMyJourney, MapsNow, SmartPackageTracker, TravelDirections, and possibly others. The Hidden Code specifically targets these extensions by using their names. For

example, the Hidden Code contains the terms: "gomapsanddirections.com," "directionsfound.com," "mapmyjourney.co," "mapsnow.co," "smartpackagetracker.com," and "traveldirections.co." Though Spigot has hundreds of competitors, nearly all the targeted extensions – five of the six – belong to Mediavo.

39.    On information and belief, Third-Party Defendant Stephens is involved in all important decisions at Spigot. Additionally, in light of Stephens's animosity toward Hoggatt and Mediavo's participation in the extensions market and on information and belief, Stephens directed or approved inclusion of the Hidden Code within the Malicious Extensions and/or acted in willful ignorance thereof.

40.    Ordinarily, to install an extension on Chrome, a user either arrives at an extension's landing page through a distribution channel or finds that extension in the Chrome Store, clicks the "Add to Chrome" button and the installation begins.

41.    But the Hidden Code deliberately hijacks that process. Once a user installs a Malicious Extension, they are no longer able to download the targeted Mediavo extension. Even if that user directly visits a Mediavo landing page from a Chrome browser, and clicks the "Add to Chrome" button, the installation never occurs. Instead, the user is placed into an endless loop where they are asked again and again to "Click 'Add to Chrome' to Install." At the same time, the "Add to Chrome" button is concealed and inaccessible because it is covered by a Counter-Defendants "search results" page full of unrelated ads. For that reason, the user is absolutely prevented from installing a product that they have already expressed interest in – they searched for or otherwise found Mediavo's extensions, attempted to install them, but were blocked by the Malicious Extensions' Hidden Code – and for no reason related to the advertised purpose of the Malicious Extensions.

42.   Below is a snapshot of how Counter-Defendants and Stephens insert a "search results" page in front of the "Add to Chrome" button, unfairly preventing the user from installing Mediavo's extension:



As shown, there is a window that states "Click 'Add to Chrome' to Install," from which a green arrow extends to the appropriate button. But the button is blocked by a Counter-Defendants "search results" page that cannot be moved.

43.   If one of the targeted Mediavo extensions is already installed on a user's computer, installation of a Malicious Extension makes the Mediavo extension inoperable. For example, MapsNow is a Mediavo extension that provides driving directions between two points. If a MapsNow user later installs one of the Malicious Extensions and tries to enter a destination in the MapsNow extension, the Malicious Extension hijacks the user's browser and directs the user instead to one of Counter-Defendants' "search results" pages. The user is thus led to believe that MapsNow is dysfunctional and/or associated with Counter-Defendants and their products, and often chooses to delete the extension.

44.    Below is a graphic that demonstrates how a MapsNow user with a Malicious Extension installed is prevented from obtaining driving directions and is instead directed to a "search results" page hosted by Counter-Defendants:



45.    The presence of the Hidden Code and its intended functions – to target and block the installation and/or use of Mediavo's extensions – is not disclosed in any of Counter-Defendants' advertisements or public statements about the Malicious Extensions.

**H.    Counter-Defendants and Stephens's false, deceptive and unfair behavior has harmed and continues to harm Mediavo.**

46.    Mediavo's extensions, including those targeted by the Malicious Extensions, are legitimate products that provide the services they claim to offer. The Hidden Code materially disrupts the functionality of the user's computer in accessing Mediavo's extensions.

47.    There is no legitimate business reason for Counter-Defendants and Stephens to hijack their users' computers and prevent them from using Mediavo's products to obtain travel directions, check weather or track packages.

48.    Counter-Defendants and Stephens have no objective, good faith basis to insert the Hidden Code into their Malicious Extensions.

49.     Counter-Defendants and Stephens have unfairly targeted Mediavo's products because they seek to undermine Mediavo's success.

50.     The Malicious Extensions are an anticompetitive attempt to drive Mediavo out of business, to Counter-Defendants and Stephens's ultimate benefit.

51.     Counter-Defendants and Stephens's unlawful conduct is willful and malicious.

52.     Counter-Defendants and Stephens's unlawful conduct is causing and will continue to cause harm to Mediavo.

53.     Mediavo has taken reasonable countermeasures to try to reduce the harm it has suffered, and continues to suffer, as a result of Counter-Defendants and Stephens's unlawful conduct, but the harm remains significant and continuing. Among other things, Mediavo has spent significant time and resources to investigate, uncover, and remediate the effects of the Hidden Code contained in the Malicious Extensions.

**COUNT I – False Advertising and Unfair Competition under the Lanham Act,**
**15 U.S.C. § 1125(a)**
**(Against All Counter-Defendants and Stephens)**

54.     Mediavo restates and re-alleges paragraphs 1–53 of its Counterclaims, above, as if fully set forth herein.

55.     The Lanham Act provides a civil remedy to "any person who believes that he or she is or is likely to be damaged" when any other person or entity "uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which" either (A) "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person," or (B) "in commercial

advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."   15 U.S.C. § 1125(a)(1)(A)–(B).

56.   As alleged above, at least five of the six extensions that the Malicious Extensions' Hidden Code targets are extensions distributed by Mediavo: GoMapsAndDirections, DirectionsFound, MapMyJourney, MapsNow, SmartPackageTracker, TravelDirections. To target those extensions among the hundreds or thousands of other competitors' extensions, the Counter-Defendants use words, terms, names, and symbols in the Malicious Extensions' Hidden Code – such as "gomapsanddirections.com," "directionsfound.com," "mapmyjourney.co," "mapsnow.co," "smartpackagetracker.com," and "traveldirections.co." – to identify Mediavo's extensions. By targeting Mediavo's extensions in this manner and by blocking users from downloading and installing them and/or redirecting users to Counter-Defendants' "search results" pages, the Malicious Extensions are likely to cause confusion or mistake among users regarding the availability and/or functionality of Mediavo's extensions and, by redirecting users to Counter-Defendants' pages, Mediavo's association with and/or approval of Counter-Defendants and their products.

57.   Counter-Defendants market the Malicious Extensions as having the intended function of "protect[ing] [users'] privacy by detecting searches that may be tracked and tied to [their] personal information." Counter-Defendants do not disclose that the Malicious Extensions have a different primary intended function, which is to block the download, installation, and/or operation of Mediavo's extensions. By advertising one supposed intended function of the Malicious Extensions but not the other, primary function, Counter-Defendants misrepresent the nature, characteristics, and qualities of the Malicious Extensions.

58.    Counter-Defendants' Malicious Extensions are internet-based products or services that are downloaded and/or used by users across the country. Counter-Defendants market and advertise the Malicious Extensions to the consuming public, including persons not currently using the Malicious Extensions, via various distribution channels, including but not limited to websites owned and operated by Counter-Defendants, e.g., searchencrypt.com. The Malicious Extensions, including the Hidden Code, and related advertisements and/or promotions are therefore deployed in and affect interstate commerce.

59.    As a result of Counter-Defendants' deceptive actions, Mediavo has and will continue to suffer damage. For example, by directing users away from Mediavo's products and to Counter-Defendants web pages, the Malicious Extensions likely have and will continue to cause users to associate Mediavo's extensions with Counter-Defendants' extensions, which have been deemed "malicious" and "unwanted" by various websites. Additionally, by failing to disclose that the Malicious Extensions have these intended purposes, Counter-Defendants' misleading advertisements and promotions likely have and will continue to cause users – who would otherwise have installed and/or used Mediavo's extensions – to download the Malicious Extensions, thereby blocking their installation and/or use of Mediavo's extensions.

60.    Third-Party Defendant Stephens is an active moving force of the actions undertaken by Counter-Defendants and thus jointly and severally liable for their actions. In light of Stephens's animosity toward Hoggatt and Mediavo's participation in the extensions market, and on information and belief, Stephens directed or approved inclusion of the Hidden Code within the Malicious Extensions and/or acted in willful ignorance thereof. Additionally, on information and belief and in light of his role as CEO of Spigot, Stephens additionally approved and/or acted in

willful ignorance of all public statements about the Malicious Extensions that did not disclose the Hidden Code's functions.

61.    As a direct and proximate result of Counter-Defendants' and Third-Party Defendant Stephens's unlawful acts, Mediavo has suffered and will continue to suffer significant monetary and reputational injury, including losses of sales and a lessening of goodwill associated with its products, in amounts that will be proven at trial.

### COUNT II – Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* (Against All Counter-Defendants and Stephens)

62.    Mediavo restates and re-alleges paragraphs 1–53 of its Counterclaims, above, as if fully set forth herein.

63.    The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq.* ("FDUTPA"), prohibits unfair methods of competition, unconscionable acts and practices, and unfair and deceptive practices in the conduct of trade or commerce.

64.    Counter-Defendants are engaged in "trade or commerce" as defined by Fla. Stat. § 501.203(8).

65.    Mediavo is an "interested party or person" as defined by Section 501.203(6), Florida Statutes.

66.    Counter-Defendants have engaged in unfair competition, unconscionable acts and practices, and unfair and deceptive acts and practices.

67.    Counter-Defendants purposefully insert themselves into the same marketplace in which Mediavo operates – the browser extension distribution industry. Counter-Defendants' deceptive and unfair advertising is directed both to Mediavo's existing and prospective customers.

68.     Counter-Defendants advertise to Mediavo's existing and prospective consumers – all of whom either have installed or have expressed an affirmative interest in Mediavo's legitimate products – in order to persuade them to install the Malicious Extensions and prevent them from using Mediavo's legitimate products.

69.     Accordingly, Counter-Defendants are in direct competition with Mediavo.

70.     Counter-Defendants' unfair competition, unconscionable acts and practices, and unfair and deceptive acts and practices, include but are not limited to: (1) the inclusion of the Hidden Code in the Malicious Extensions, which uses words, terms, names, and symbols – such as "gomapsanddirections.com," "directionsfound.com," "mapmyjourney.co," "mapsnow.co," "smartpackagetracker.com," and "traveldirections.co." – to target and then block and/or redirect from Mediavo's extensions, and (2) the failure to disclose the Malicious Extensions' intended purpose, which is to target, block, and redirect from Mediavo's extensions.

71.     Counter-Defendants knew or should have known that the above acts and practices were deceptive and unfair. Such knowledge, whether actual or constructive, is demonstrated by, among other things, the fact that the Hidden Code targets Mediavo's extensions by name and the Counter-Defendants' failure to disclose these intended functions of the Malicious Extensions.

72.     Counter-Defendants intended that the above deceptive and unfair practices would induce Mediavo's existing and prospective customers to rely and act on them and, in fact, Mediavo's existing and prospective customers did rely on Counter-Defendants' deceptive and unfair practices by installing the Malicious Extensions.

73.     Counter-Defendants' actions constitute unfair and deceptive trade practices, in that their actions offend established public policy, are immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers and businesses alike.

74.    Counter-Defendants' actions constitute unconscionable commercial practices, deception, fraud, false pretenses, misrepresentation and the known concealment and misrepresentation of material facts, all in violation of FDUTPA.

75.    As a direct and proximate result of Counter-Defendants' unfair competition, unconscionable acts and practices, and unfair and deceptive acts and practices, as outlined above, consumers have been damaged. Consumers that install the Malicious Extensions are led to believe that the Malicious Extensions will perform as advertised and only as advertised. In fact, undisclosed to the consumers, the Malicious Extensions secretly hijack consumers' browsers, specifically target Mediavo's extensions, and prevent consumers from downloading and/or using Mediavo's products for no reason related to the advertised properties of the Malicious Extensions. By downloading and installing the Malicious Extensions, consumers unknowingly render Mediavo's extensions unavailable and/or unusable.

76.    As a direct and proximate result of Counter-Defendants' unfair competition, unconscionable acts and practices, and unfair and deceptive acts and practices, as outlined above, aimed at consumers in the browser extension marketplace, Mediavo has suffered substantial injury. After viewing Counter-Defendants' marketing materials and installing the Malicious Extensions, consumers are prevented from accessing legitimate products offered by Mediavo that they expressly selected over other products offering a similar service.

77.    Counter-Defendants' conduct has also fraudulently hijacked the browsers of Mediavo's consumers and interfered with the operation of Mediavo's legitimate products.

78.    Mediavo has a clear legal right or interest in being free from Counter-Defendants' deceptive or unfair practices, as such practices have harmed and injured Mediavo and its

consumers, and will result in future harm and injury to Mediavo and its consumers if Counter-Defendants are not enjoined.

79.     Counter-Defendants are continuing to engage in such deceptive and unfair practices for the purpose of hijacking consumers' browsers, causing confusion, and preventing consumers from accessing Mediavo's legitimate products without any valid legal basis. Therefore, there is a strong likelihood that Mediavo and its consumers will suffer irreparable harm on an ongoing basis, and any remedy at law for Counter-Defendants' perpetuation of the deceptive, fraudulent, and unfair marketing and solicitation practices, is inadequate.

80.     Third-Party Defendant Stephens is an active moving force of the actions undertaken by Counter-Defendants and thus jointly and severally liable for their actions. In light of Stephens's animosity toward Hoggatt and Mediavo's participation in the extensions market, and on information and belief, Stephens directed or approved inclusion of the Hidden Code within the Malicious Extensions and/or acted in willful ignorance thereof. Additionally, on information and belief and in light of his role as CEO of Spigot, Stephens additionally approved and/or acted in willful ignorance of all public statements about the Malicious Extensions that did not disclose the Hidden Code's functions, and intentionally managed Spigot in a manner that was deceptive, actively directed Counter-Defendants' efforts to circumvent Mediavo and unfairly compete with it.

81.     Pursuant to Fla. Stat. §§501.211(2) and 501.2105, Mediavo is entitled to actual damages, in an amount to be proven at trial, attorney's fees, and costs.

**COUNT III – Violation of, and Conspiracy to Violate, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030**
**(Against All Counter-Defendants and Stephens)**

82.     Mediavo restates and re-alleges paragraphs 1–53 of its Counterclaims, above, as if fully set forth herein.

83.     The Computer Fraud and Abuse Act ("CFAA") provides that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

84.     Section 1030(a)(5)(A) of the CFAA prohibits a person or entity from "knowingly caus[ing] the transmission of a program, information, code, or command" that "intentionally causes damage without authorization, to a protected computer."

85.     Counter-Defendants knowingly transmitted the Malicious Extensions containing the Hidden Code to users' protected computers. The users' computers are "protected computers" as that term is defined in 18 U.S.C.§ 1030(e)(2) because they are connected to the internet and therefore "used in or affecting interstate or foreign commerce or communication."

86.     The Malicious Extensions, by way of the Hidden Code, intentionally targeted and impeded the availability and functionality of Mediavo's extensions on users' protected computers. Counter-Defendants' transmission of the Hidden Code, and the resulting damage to Mediavo (described below), was without authorization in at least the following ways: (1) Counter-Defendants did not disclose to users and/or prospective users that the Malicious Extensions would impede the downloading of Mediavo's extensions; and/or (2) Counter-Defendants did not disclose to users and/or prospective users that the Malicious Extensions targeted Mediavo's extensions and

would hijack the users' browsers to redirect them from Mediavo's extensions to one of Counter-Defendants' "search results" pages.

87.   Mediavo suffered damage as a result of Counter-Defendants' knowing transmission of the Malicious Extensions containing the Hidden Code to users' protected computers, including impairment to the availability and functionality of Mediavo's extensions on the users' protected computers. As Mediavo's investigation and remedial efforts remain ongoing, it is unable to state the full extent of its damages, including injury and harm arising from the interruption of service caused by the Malicious Extensions. The harm that Mediavo has suffered totals at least $5,000 in loss in a one-year period, including the cost of investigating and responding to Counter-Defendants' Malicious Extensions and Hidden Code, conducting damage assessments, ongoing attempts to mitigate the effects of the Malicious Extensions and the Hidden Code, and lost revenues resulting from the impairment and/or interruption of Mediavo's extensions.

88.   Third-Party Defendant Stephens is an active moving force of the actions undertaken by Counter-Defendants and thus jointly and severally liable for their actions. In light of Stephens's animosity toward Hoggatt and Mediavo's participation in the extensions market, and on information and belief, Stephens directed or approved inclusion of the Hidden Code within the Malicious Extensions and directed or approved the transmission of the Malicious Extensions (with Hidden Code) to users' protected computers, and/or acted in willful ignorance thereof. Additionally, on information and belief and in light of his role as CEO of Spigot, Stephens additionally approved and/or acted in willful ignorance of all public statements about the Malicious Extensions that did not disclose the Hidden Code's functions.

89.   Additionally, Counter-Defendants and Third-Party Defendant Stephens have conspired to commit or attempt to commit the above-described violation of the CFAA. 18 U.S.C.

§ 1030(b). As described in more detail above and in Paragraph 118 below, which is incorporated here by this reference, Counter-Defendants are separate legal entities. Third-Party Defendant Stephens is CEO of Spigot, which licenses the Malicious Extensions from Eightpoint and markets them to the consuming public. On information and belief, each of the Counter-Defendants and Third-Party Defendant Stephens agreed between and amongst each of them to develop, market, and make available the Malicious Extensions that contain the Hidden Code with the objective of transmitting the Hidden Code, without authorization, to users' protected computers and intentionally causing the damage described above in violation of 18 U.S.C. § 1030(a)(5)(A).

90.    Unless enjoined, Counter-Defendants and Third-Party Defendant Stephens will continue to transmit the Malicious Extensions and the Hidden Code to users and prospective users, and will continue to cause harm to Mediavo.

91.    Mediavo is entitled to damages and injunctive relief for Counter-Defendants' violations of Section 1030(a)(5)(A) of the CFAA in an amount to be determined at trial.

**COUNT IV – Violation of the Federal Wiretap Act,**
**18 U.S.C. § 2510, *et seq.***
**(Against All Counter-Defendants and Stephens)**

92.    Mediavo restates and re-alleges paragraphs 1–53 of its Counterclaims, above, as if fully set forth herein.

93.    The Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq.*, provides that "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity . . . which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a).

94.    The Federal Wiretap Act prohibits a person or entity from "intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor

to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). The Federal Wire Tap Act also prohibits a person or entity from "intentionally us[ing], or endeavor[ing] to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication." *Id.* § 2511(1)(d).

95.    Mediavo is engaged in electronic communication, as that term is defined in 18 U.S.C. § 2510(12), with current and prospective users of its extensions. Such communications take place via the internet, affecting interstate or foreign commerce, and include users' requests to install Mediavo's extensions and/or to take advantage of the functionality of Mediavo's extensions that have already been installed, as well as Mediavo's communications to users in providing its extensions for installation and/or the functions associated with already-installed extensions.

96.    Through the Malicious Extensions and the Hidden Code, Counter-Defendants contemporaneously intercept the content of these electronic communications between Mediavo and its current and prospective users. Counter-Defendants' interception of such electronic communications is intentional, as reflected in the Malicious Extensions' and the Hidden Code's targeted effect on Mediavo's extensions, and such interception is done without the consent of either Mediavo or the current and/or prospective users of Mediavo's extensions.

97.    Through the Malicious Extensions and the Hidden Code, Counter-Defendants additionally use, or attempt to use, the contents of the electronic communications between Mediavo and its current and prospective users. Counter-Defendants have used and continue to use such content by, *inter alia*, intentionally using the intercepted communications to block the installation of Mediavo's extensions by prospective users and/or hijacking current users' browsers to redirect them to Counter-Defendants' "search results" pages. Counter-Defendants knew or had

reason to know that the electronic communications were intercepted in violation of the Federal Wire Tap Act. Such knowledge, whether actual or constructive, is demonstrated by, among other things, the fact that the Hidden Code targets Mediavo's products by name, as well as Counter-Defendants' failure to describe the Hidden Code's targeted interception and subsequent use of the content of such intercepted communications to either block access to Mediavo's extensions or to effectively disable already-installed extensions.

98.     Third-Party Defendant Stephens is an active moving force of the actions undertaken by Counter-Defendants and thus jointly and severally liable for their actions. In light of Stephens's animosity toward Hoggatt and Mediavo's participation in the extensions market, and on information and belief, Stephens directed or approved inclusion of the Hidden Code within the Malicious Extensions and, as a result, directed or approved the interception and use of electronic communications between Mediavo and users, and/or acted in willful ignorance thereof. Additionally, on information and belief and in light of his role as CEO of Spigot, Stephens additionally approved and/or acted in willful ignorance of all public statements about the Malicious Extensions that did not disclose the Hidden Code's functions.

99.     As a result of Counter-Defendants' and Third-Party Defendant Stephens's violations of the Federal Wiretap Act, Mediavo is entitled to damages, including the greater of actual damages and Counter-Defendants' profits or statutory damages (in the amount of $100 a day for each day of violation or $10,000, whichever is greater), punitive damages, injunctive relief, and reasonable attorneys' fees and other litigation costs.

**COUNT V – Violation of Florida's Security of Communications Law**
**Fla. Stat. § 934.01, *et seq.***
**(Against All Counter-Defendants and Stephens)**

100.  Mediavo restates and re-alleges paragraphs 1–53 of its Counterclaims, above, as if fully set forth herein.

101.  Florida's Security of Communications Law, Fla. Stat. §§ 934.01, *et seq.*, provides that "[a]ny person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of ss. 934.03-934.09 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any other person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any such person or entity which engaged in that violation such relief as may be appropriate."  Fla. Stat. § 934.10(1).

102.  Florida Statute § 934.03 prohibits any person or entity from "[i]ntentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept any wire, oral, or electronic communication."  Fla. Stat. § 934.03(1)(a).  The statute also prohibits any person or entity from "[i]ntentionally us[ing], or endeavor[ing] to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection."  *Id.* § 934.03(1)(d).

103.  Mediavo is engaged in electronic communication, as that term is defined in Fla. Stat. § 934.02(12), with current and prospective users of its extensions. Such communications take place via the internet, affecting intrastate, interstate, or foreign commerce, and include users' requests to install Mediavo's extensions and/or to take advantage of the functionality of Mediavo's extensions that have already been installed, as well as Mediavo's communications to users in

providing its extensions for installation and/or the functions associated with already-installed extensions.

104. Through the Malicious Extensions and the Hidden Code, Counter-Defendants contemporaneously intercept the content of these electronic communications between Mediavo and its current and prospective users. Counter-Defendants' interception of such electronic communications is intentional, as reflected in the Malicious Extensions' and the Hidden Code's targeted effect on Mediavo's extensions, and such interception is done without the consent of either Mediavo or the current and/or prospective users of Mediavo's extensions.

105. Through the Malicious Extensions and the Hidden Code, Counter-Defendants additionally use, or attempt to use, the contents of the electronic communications between Mediavo and its current and prospective users. Counter-Defendants have used and continue to use such content by, *inter alia*, intentionally using the intercepted communications to block the download and installation of Mediavo's extensions by prospective users and/or hijacking current users' browsers to redirect them to Counter-Defendants' "search results" pages. Counter-Defendants knew or had reason to know that the electronic communications were intercepted in violation of Fla. Stat. § 934.03. Such knowledge, whether actual or constructive, is demonstrated by, among other things, the fact that the Hidden Code targets Mediavo's products by name, as well as Counter-Defendants' failure to describe the Hidden Code's targeted interception and subsequent use of the content of such intercepted communications to either block access to Mediavo's extensions or to effectively disable already-installed extensions.

106. Third-Party Defendant Stephens is an active moving force of the actions undertaken by Counter-Defendants and thus jointly and severally liable for their actions. In light of Stephens's animosity toward Hoggatt and Mediavo's participation in the extensions market, and on

36

information and belief, Stephens directed or approved inclusion of the Hidden Code within the Malicious Extensions and, as a result, directed or approved the interception and use of electronic communications between Mediavo and users, and/or acted in willful ignorance thereof. Additionally, on information and belief and in light of his role as CEO of Spigot, Stephens additionally approved and/or acted in willful ignorance of all public statements about the Malicious Extensions that did not disclose the Hidden Code's functions.

107.  As a result of Counter-Defendants' and Third-Party Defendant Stephens's violations of Fla. Stat. § 934.03, Mediavo is entitled to damages, including the greater of actual damages (but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher), punitive damages, injunctive relief, and reasonable attorneys' fees and other litigation costs.

**COUNT VI – Tortious Interference with Business Relations**
**(Against All Counter-Defendants and Stephens)**

108.  Mediavo restates and re-alleges paragraphs 1–53 of its Counterclaims, above, as if fully set forth herein.

109.  Mediavo has business relationships with customers who have already installed Mediavo's extensions ("Existing Customers") and business relationships with customers who seek to install Mediavo's legitimate products ("Prospective Customers"). Such Prospective Customers search for and/or otherwise attempt to download and install Mediavo's extensions and, if not for Counter-Defendants' unlawful interreference, would have downloaded and installed Mediavo's extensions. These Prospective Customers' attempt to download and install Mediavo's extensions thus reflect an actual and identifiable understanding and agreement between Mediavo and the Prospective Customers that in all probability would have been completed if not for Counter-Defendants' interference.

110. As outlined above, Counter-Defendants had knowledge of these relationships between Mediavo and Existing Customers and Prospective Customers. Counter-Defendants' knowledge of these relationships is demonstrated by, among other things, the Hidden Code, which specifically targets Mediavo's extensions by name and thereby specifically targets Mediavo's relationships with Existing Customers and Prospective Customers who attempt to install and/or use those extensions. The Hidden Code was inserted into the Malicious Extensions precisely because Counter-Defendants knew about Mediavo's relationships with Existing Customers and Prospective Customers and Counter-Defendants wanted to interfere with those relationships.

111. By persuading Existing Customers and Prospective Customers to install the Malicious Extensions – without disclosing that they target, block, render unusable, and redirect from Mediavo's extensions – and by automatically blocking the installation and/or operation of Mediavo's extensions, Counter-Defendants have intentionally interfered with the actual and identifiable business relationships that exist between Mediavo and its Existing Customers and Prospective Customers.

112. But for Counter-Defendants' interference, Mediavo's Existing Customers would have in all probability continued to use Mediavo's extensions, and Prospective Customers would have in all probability installed and used Mediavo's extensions. If such Existing Customers and Prospective Customers had continued to use and/or install Mediavo's extensions, they would have been shown advertisements and/or have clicked on advertisements, which, as explained in further detail in Paragraph 20, would have resulted in revenue to Mediavo.

113. Counter-Defendants have acted solely out of malice in wrongfully and misleadingly representing the properties and functionality of the Malicious Extensions and blocking the installation and operation of Mediavo's legitimate products without user consent.

114.  Counter-Defendants' actions as alleged herein are an improper and illegitimate means of competition undertaken for the sole purpose of inflicting intentional harm upon Mediavo.

115.  Third-Party Defendant Stephens personally directed Counter-Defendants' tortious actions and is thus personally liable. As CEO of Spigot and with experience in the extensions business, Stephens knew about Mediavo's relationships with Existing Customers and Prospective Customers. Additionally, in light of Stephens's animosity toward Hoggatt and Mediavo's participation in the extensions market, and on information and belief, Stephens directed or approved inclusion of the Hidden Code within the Malicious Extensions and, as a result, directed or approved Counter-Defendants' tortious interference with Mediavo's contracts with Existing Customers and Prospective Customers, and/or acted in willful ignorance thereof.

116.  As a result of Counter-Defendants' and Third-Party Defendant Stephens's tortious interference, Mediavo has suffered damages in amounts that will be proven at trial but that are believed to or will exceed $75,000, exclusive of interest and costs.

### COUNT VII – Civil Conspiracy
### (Against All Counter-Defendants and Stephens)

117.  Mediavo restates and re-alleges paragraphs 1–53 of its Counterclaims, above, as if fully set forth herein.

118.  As alleged above, the Malicious Extensions are owned by Eighpoint, which is a subsidiary of Genimous and an affiliate of Polarity. Eightpoint licenses the Malicious Extensions to Spigot, of which Third-Party Defendant Stephens is the CEO, and Spigot markets the Malicious Extensions to the market. On information and belief, Genimous established Eightpoint and Polarity, which are respectively based in the Cayman Islands and Cyprus, so that it could transfer ownership and profits of Spigot's extensions to offshore tax-favored jurisdictions.

119.  In light of the forgoing, and on information and belief, each of the Counter-Defendants and Third-Party Defendant Stephens agreed between and amongst each of them to develop, market, and make available the Malicious Extensions that contain the Hidden Code and thus to commit the unlawful acts described above, including by deceptively marketing the Malicious Extensions in violation of the Lanham Act and FDUTPA, violating the CFAA, violating the Federal Wire Tap Act, violating Florida's Security of Communications Law, Fla. Stat. §§ 934.01, *et seq.*, and interfering with Mediavo's business relations with its Existing Customers and Prospective Customers.

120.  Counter-Defendants and Third-Party Defendant Stephens have done overt acts in furtherance of the conspiracy, including by developing and implementing the Hidden Code in the Malicious Extensions, licensing the extensions among themselves, marketing the Malicious Extensions, not disclosing material aspects of the Malicious Extensions' and Hidden Code's functionality such as their targeted impairment of Mediavo's extensions, and allowing the Malicious Extensions, by way of the Hidden Code, to impair the availability and functionality of Mediavo's extensions.

121.  As a result of Counter-Defendants' and Third-Party Defendant Stephens' conspiracy and the acts done in furtherance thereof, Mediavo has been damaged. Such damage includes, but is not limited to, the impairment of Mediavo's extensions, including their availability and functionality, lost Existing Customers and Prospective Customers, lost profits, and costs to investigate the Malicious Extensions and remediate their effects.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaimant Mediavo, Inc. requests this Court enter judgment in its favor as follows:

1.   Declaring that Counter-Defendants and Stephens's conduct violates 15 U.S.C. § 1125(a);

2.   Declaring that Counter-Defendants and Stephens's conduct violates Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*;

3.   Declaring that Counter-Defendants and Stephens's conduct violates the Computer Fraud and Abuse Act, 18 U.S.C. § 1030;

4.   Declaring that Counter-Defendants and Stephens's conduct violates the Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq.*;

5.   Declaring that Counter-Defendants and Stephens's conduct violates Florida's Security of Communications Law, Fla. Stat. §§ 934.01, *et seq.*;

6.   Declaring that Counter-Defendants and Stephens's conduct constitutes tortious interference with business relations under the laws of the State of Florida;

7.   Preliminarily and permanently enjoining Counter-Defendants and Stephens from programming the Malicious Extensions to block installation and/or operation of Mediavo's legitimate products;

8.   Awarding Mediavo compensatory damages, punitive damages, special damages, statutory damages, lost profits, and interest, in an amount proven at trial;

9.   Awarding Mediavo its attorneys' fees and costs incurred in bringing this action; and

10.   Awarding such other and further relief as the Court deems proper.

**DEMAND FOR JURY TRIAL**

Mediavo demands a trial by jury on all issues so triable.

Dated: July 2, 2020

Respectfully submitted,

PERETZ CHESAL & HERRMANN, P.L.

/s/ Steven Peretz
Steven Peretz, Florida Bar No. 329037
One Biscayne Tower
2 South Biscayne Boulevard, Suite 3700
Miami, FL 33131
Telephone:                    (305) 341-3000
Facsimile:                    (305) 371-6807
Email:                  *speretz@pch-iplaw.com*

Counsel for Defendant
MEDIAVO and JEREMY MATTHEW HOGGATT

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served on July 2, 2020 on all counsel or parties of record in the manner specified on the Service List below.

/s/ Steven Peretz

## **SERVICE LIST**

M. Cristina Cardenas
ccardenas@reedsmith.com
Reed Smith
1001 Brickell Bay Drive, Suite 900
Miami, Florida 33131
*Via CM/ECF*

Christopher W. Healy
chealy@reedsmith.com
Reed Smith
599 Lexington Avenue, 22nd Floor
New York, NY 10022
*Via CM/ECF*